UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | | |
|---|---|---|
| ROBERT L. OVERTON, | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| vs. | ) | CAUSE NO. 3:04-CV-419 RM |
| | ) | |
| JO ANNE B. BARNHART, | ) | |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY, | ) | |
| | ) | |
| Defendant | ) | |

OPINION AND ORDER

Robert Overton seeks review of the Social Security Commissioner's denial of his claims for disability insurance benefits and supplemental security income. The Court has jurisdiction over this action pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3). For the reasons that follow, the court affirms the Commissioner's decision.

Mr. Overton, a 43-year-old former school custodian, believes his eye problems, which he understands to be photophobia,[1] have disabled him. Mr. Overton applied for benefits in January 2002. An Administrative Law Judge conducted a hearing in October 2003, attended by Mr. Overton and his attorney, an opthalmologist, an internist, and a vocational expert. The ALJ could find no medical evidence to support Mr. Overton's claims, and so found Mr. Overton's

---

[1] Photophobia is defined in Taber's Cyclopedic Medical Dictionary, 1472 (18th Ed. F.A. Davis Company, 1997), as "unusual intolerance of light. Occurs in measles and rubella, meningitis, and inflamation of the eyes."

report of his symptoms to be incredible. Given that finding, the ALJ found that Mr. Overton was not disabled because he could perform his past relevant work and a significant number of other jobs. The Appeals Council denied review, making the ALJ's decision the final Agency decision. 20 C.F.R. § 404.981; Fast v. Barnhart, 397 F.3d 468, 470 (7th Cir. 2005).

Mr. Overton challenges the ALJ's finding that he had a severe visual impairment that limited him to jobs that required neither fine visual acuity nor work in an environment with concentrated exposure to dust. He also argues that the ALJ should have explored whether a mental impairment might be the cause of Mr. Overton's vision problem.

Judicial review of the Commissioner's final decision is limited. 42 U.S.C. § 405(g); Jones v. Shalala, 10 F.3d 522, 523 (7th Cir. 1993). A court must sustain the ALJ's findings so long as they are supported by substantial evidence. 42 U.S.C. 405(g); Scott v. Barnhart, 297 F.3d 589, 593 (7th Cir. 2002); Schoenfeld v. Apfel, 237 F.3d 788, 792 (7th Cir. 2001). The term "substantial evidence" means "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971); *see also* Rice v. Barnhart, 384 F.3d at 368-369. A court may not substitute its judgment for that of the ALJ by reconsidering the facts, reweighing the evidence or resolving factual disputes. Scott v. Barnhart, 297 F.3d at 593; Maggard v. Apfel, 167 F.3d 376, 378 (7th Cir, 1999). The reviewing court may not reconsider credibility determinations made by the ALJ unless those

determinations are patently wrong. Zurawski v. Halter, 245 F.3d at 887; Powers v. Apfel, 207 F.3d 431, 435 (7th Cir. 2000).

While the ALJ needn't discuss every piece of evidence in the record, Dixon v. Massanari, 270 F.3d 1171, 1176 (7th Cir. 2001), the decision must demonstrate the path of his reasoning, and the evidence must lead logically to his conclusion. Rohan v. Chater, 98 F.3d 966, 971 (7th Cir. 1996). Remand is required if the reviewing court cannot discern an "accurate and logical bridge between the evidence and the result." Sarchet v. Chater, 78 F.3d 305, 307 (7th Cir. 1996).

When examined against this standard, the ALJ's decision cannot be overturned; substantial evidence supports it.

Mr. Overton completed high school and has no further education. He has been seeing doctors for vision problems since November 1996, when an eye examination showed corneal edema of the left eye of unknown cause. An examination in December 1996 showed his visual acuity to be 20/200 without refraction; his distant vision was 20/30. Mr. Overton told the ALJ that around 1998, he started wearing a hat because of his eyes' sensitivity to light and his eyes started to burn when he worked under fluorescent lights. He said he started wearing sunglasses all the time around 1999.

An examination in March 1999 reported myopic astigmatism; his visual acuity without glasses was 20/200-2 in each eye, though his vision improved to 20/25 with refraction. Mr. Overton began seeing Dr. Conard after that examination. After examinations in April and June 1999, Dr. Conard found Mr.

3

Overton to have myopia and iritis (an infection) and prescribed Keflex and Prednisone Forte. At that point, Mr. Overton indicated problems that previously had affected only his right eye were affecting both eyes. In May 2000, Dr. Conard found Mr. Overton's eyes to be irritated, and indicated that Mr. Overton's corrected visual acuity was 15/20 and 20/25, though the record is unclear about which eye or eyes were described.

In May 2000, Mr. Overton also saw Dr. Ray Maturi. He told Dr. Maturi that he had problems with night vision and couldn't see stars. Dr. Maturi's impression was nyctalopia with excellent vision, a condition that raises the possibility of very early rod-cone degeneration. Dr. Maturi noted Mr. Overton's history of drinking 50-60 beers monthly and smoking three packs a day. He suggested additional testing and that Mr. Overton take vitamins to address possible nutritional deficiencies. In November 2000, Mr. Overton told Dr. Maturi that he was sensitive to light and used marijuana for relief of eye strain. Dr. Maturi noted that without correction, Mr. Overton could count fingers at 3-4 feet with his right eye and at 6 feet with his left. Dr. Maturi found no disease process to account for Mr. Overton's complaints.

Mr. Overton underwent an MRI scan of his head in January 2001. The scan was read as within normal limits. Dr. Valerie Purvin, a neuro-ophthalmalogist, found hypervascularity of right pars sella, but no actual aneurysm. Dr. Purvin's impression was photosensitivity, but added that the neuro-opthalmologic examination showed no cause for marked photosensitivity. Dr. Purvin described

4

Mr. Overton as a challenging patient. Dr. Purvin prescribed Elavil in hopes of raising Mr. Overton's pain threshold, making him less photosensitive. Mr. Overton was concerned about taking this medicine, which he saw as only for pain or depression, and he had neither. Mr. Overton told the ALJ that he stopped driving around 2001.

Social Security asked Dr. David Magnante to perform a consultative examination of Mr. Overton's eyes in April 2002. Dr. Magnante's impression was cortical cataract in both eyes, regular astigmatism in both eyes, and myopia — an error in refraction in which light rays are focused in front of the retina, enabling the person to see distinctly for only a short distance — that he described as high. He found that the visual fields in both eyes have a 50 percent defect in all quadrants. Dr. Magnante couldn't find anything to account for Mr. Overton's complaint. Dr. L. Bastnagel reviewed the record for the state agency in May 2002, and found no abnormalities that would affect vision field or acuity.

In November 2002, Dr. John Corbin (who first examined Mr. Overton in November 2002) found amblyopia of Mr. Overton's right eye. Mr. Overton reported dry eye and described himself as extremely photophobic. Dr. Corbin found mild nuclear cortical cataracts in each eye. The pupil examination showed moderately cupped nerve heads, no disc edema, no macular degeneration, and relatively healthy eyes. Dr. Corbin diagnosed myopia with astigmatism, said the prognosis was fair with new glasses, and said Mr. Overton's condition will continue throughout his life and is progressive vision deterioration. Dr. Corbin thought Mr.

5

Overton's difficulties might be a congenital condition. When asked how Mr. Overton's vision problems affected his work ability, Dr. Corbin said it affected his ability to work with small detail, but did not prevent Mr. Overton from working. Dr. Corbin imposed no limitations relating to photosensitivity, and did not list photosensitivity as a diagnosis.

Mr. Overton told the ALJ that his problem with sensitivity to light had developed about five years ago, and had caused him to stop working as a janitor: his job took him too long, and efforts to continue working that way were stressful. Mr. Overton told the ALJ that one eye became blurry about three feet out and the other eye at two feet out. He said he could be in direct sun for thirty to sixty minutes. He said he couldn't keep focused on things, and that when he tries to do so, his eyes "like cramp up." Mr. Overton told the ALJ his eyes turned bloodshot from exposure to light, and that the time spent in the hearing would have made them bloodshot. The ALJ asked Mr. Overton to remove his dark glasses, and according to Dr. David Kenney, Mr. Overton's eyes were not bloodshot at that point.

Mr. Overton said he now uses his left hand more than his dominant right because his vision is better on his left side. He told the ALJ that walking motion blurs his eyes, so he looks down at his feet when he walks. Mr. Overton said he could use a microwave to prepare food, could use a knife to slice food, could dial a phone, and could read for about five minutes at a time. Mr. Overton prints, and can barely read cursive writing any more. He said he took no medication other

6

than children's aspirin during cold season. He told the ALJ he has always had some knee discomfort, and still did by the time of the hearing. He disclaimed any other problems.

Mr. Overton told the ALJ he had stopped drinking and smoking marijuana, and had cut his smoking back to a pack a day. He said he had never had any mental health counseling.

Dr. Kenney, a medical expert in ophthalmology, testified at the hearing that Mr. Overton is quite nearsighted with a moderate amount of astigmatism, and has severe myopia. Dr. Kenney testified that Mr. Overton was born with the astigmatism, and that the vision problems do not meet a listing. Dr. Kenney suggested that Mr. Overton should avoid dusty environments that might exacerbate sensitivity.

When the ALJ asked Dr. Emily Giesel, who was testifying as an internal medicine expert, whether she could add anything to the record, she disclaimed any insight into Mr. Overton's vision problems, and briefly addressed other issues, such as migraine headaches and joint pains. The following exchange then occurred:

> Q [By ALJ]: Do you know of anything that, internally that could be causing this stuff that you've read in your literature or anything like that?
>
> A [By Dr. Giesel]: Judge, my one thought would be that it might be a conversion reaction, I guess, pyschologically based.

No health care provider in the record before the ALJ and this court ever diagnosed photosentivity or photophobia. Four health care providers — Dr. Corbin, Dr. Maturi, Dr. Magnante, and Dr. Purvin — could find nothing to account for Mr. Overton's complaints.[2] No health care provider found any functional limitations based on photosensitivity.

This record contains more than ample evidence for the ALJ to have decided what he did: that because one health care provider after another had examined Mr. Overton without diagnosing or accounting for photosensitivity or photophobia, and without imposing any work restriction, Mr. Overton had no impairment or combination of impairments that significantly limited his physical or mental ability to do basic work activities, and accordingly, that Mr. Overton did not have a severe impairment and so wasn't disabled. 20 C.F.R. § 404.1520(c). Other findings might have been possible, but what the ALJ found was based on substantial evidence in the record.

Mr. Overton also argues that the ALJ erred by not inquiring further into the possibility of a mental impairment. Neither Mr. Overton nor his attorney appear to have suggested such a thing to the Commissioner or to the ALJ, and nothing in the record suggests any mental impairment. None of the health care providers that Mr. Overton saw referred him for mental evaluation or treatment. Dr. Giesel mentioned the possibility of a psychologically based conversion reaction, but it is

---

[2] Dr. Purvin noted an impression of photosensitivity, but backed off that impression after a neuroophthalmologic examination.

not clear to the court whether she was referring to Mr. Overton's eye problems or his arthritis, and she made her comment only after disclaiming any insight into Mr. Overton's vision issues.

The ALJ asked Mr. Overton about past mental health counseling, about his family life, and about interactions with his family and others. Mr. Overton now complains that the ALJ was "playing doctor" by these questions. The court disagrees. It appears that the ALJ's inquiries were designed not to produce a medical diagnosis, but rather to probe for any need for a mental evaluation. Nothing in the record — not the answers to those questions, not Mr. Overton, not Mr. Overton's past health care providers or evaluators, not Mr. Overton's attorney, not Dr. Giesel's ambiguous comment — indicated a need for such an evaluation.

Today's decision should not be read as minimizing Mr. Overton's vision problems. Today's decision inquires only whether the ALJ erred in not probing further into Mr. Overton's mental condition, or reached a decision not supported by substantial evidence. For the reasons set forth above, the court AFFIRMS the Commissioner's decision.

ENTERED:   October 19, 2005

　　　　　　　　　　　　　　　　　　　　　　/s/ Robert L. Miller, Jr.
　　　　　　　　　　　　　　　　　　　　　Chief Judge
　　　　　　　　　　　　　　　　　　　　　United States District Court


cc:   J. Roth

C. Johnson